Good afternoon, Illinois Appellate Court, First District Court is now in session. The First Division, the Honorable Justice Carl Anthony Walker presiding, case number 1-9-1-6-3-9, Paula Corvarubas versus City of Chicago. Corvarubas. Thank you, Darren. Good afternoon, everybody. I'm Justice Walker, and I have here with me Justice Hyman and Justice Pierce. And I'd like to start by asking the lawyers if you could please introduce yourselves. Your Honor, Ruth Masters on behalf of the City of Chicago. Okay, thank you. And counsel? Ms. Bartolosi, are you arguing on behalf? Of the appellant? I think maybe she's having some difficulties. Ms. Bartolosi, we do require you to keep your video on when you're speaking, your audio must be on. So if you're able to introduce yourself, please do that. Mrs. Bartolosi, if you're having problems, can you sign out and sign back in, please? Thank you, Darren. You're welcome. Are you able to introduce yourself now? Ms. Bartolosi, we have your video, but we don't have any audio for you. And if you're on your computer, Ms. Bartolosi, you may have to sign off, sign back in, and then allow your computer to use its audio. Because you may have said no when you logged in. Thank you. Justice Walker, do you want me to sign her off so she can sign back in? Yes, please. All right. Sometimes if you sign them off, they can't come back in. No, she can come back in if she clicks the link back on. Okay. Okay. Again, we can see your video. We see you, but we don't have audio. So you may have said you didn't want to use computer audio when you signed in. So you may have to sign out, come back in, and allow computer audio. Okay. Justice Walker, give me a couple of minutes. I'm on the phone with Ms. Bartolosi. Thank you. Okay. Hello? Yes. Hi. Good afternoon. I'm so sorry. I've done a million of these Zooms, but somehow everything went wrong today. Okay. You're fine. If you could just please introduce yourself for the record. Yes. I'm Elizabeth Bartolosi on behalf of the Plaintiff Appellant, Paula Covarrubias. Approximately how much time do you need today? I was thinking 10 minutes to start and reserve the rest. Okay. That'll be fine. And Ms. Masters, how much time do you need today? 15 minutes, Your Honor, please. I was assuming that counsel was going to have 15 minutes as well. Yeah. Actually, we give each side 20 minutes. So if you need to take the entire 20 minutes, that's fine. Once you get over 20 minutes, we will advise you that you're at time. And if you have a point that you intended to make to us and you didn't get to it because we're asking too many questions, let us know that and we'll give you a minute or two to sort of close out. Thank you, Your Honor. Yes, I will take 20 minutes. Okay. Sure. That's fine. All right. So let's start with you, Ms. Bartolosi. Okay. May it please the court and counsel. Your Honors, the issue here today, the one of duty is not in dispute, I don't think. We have a statute, Section 3-102 of the Tort Immunity Act, which codifies a common law duty of care applicable to municipalities. So it's a duty to exercise ordinary care to maintain city property or other public property in a reasonably safe condition. So the question of duty here is established as a matter of law, as it is in most cases. And so on that point, the plaintiff obviously met her burden. The issue that comes up is what factually was that duty? What did it look like? What is the duty to maintain? So in this case, there truly was no evidence of maintenance by the city. What came out at trial- But was there any evidence though, when you say there's no evidence of maintenance, was there any evidence that the city had any notice whatsoever? Because it's my understanding that there were never any complaints about this particular light bulb. Right. But Your Honor, I think that the problem there, which I do want to address because it's key here, is that you're addressing notice in terms of having to repair something, really. Notice of a defect that would require the city to repair the defect or prevent against people being injured by it. I'm just starting off here with the basic premise that there's an undisputed duty the city has to maintain its property in a reasonably safe condition. So the plaintiff alleged in her complaint, it failed to do that. Of course, the city is the entity in control of the information regarding how it maintains its own property. So of course, there was discovery on that. There were depositions. But what came out at trial was truly no evidence of maintenance. And when I speak of maintenance, I mean proactive maintenance. Anything the city did affirmatively to... Is that the issue? I thought the issue had to do with conspicuous... It's hard to say, but you put it on the screen. Conspicuous unity? Conspicuous. I'll use the word conspicuous. You can say conspicuousness too. I waffled between using that instead. Thank you. I find it hard to say. But there's conspicuousness and then there's a time. And there's no question on the time. The evidence is five years that this has been going on, probably. But the question, as I read everything, was whether it was conspicuous. That they have a duty is understood. That's the first thing you said. They have their duty. They're not saying they didn't have that duty. But what they are saying is they didn't know about this specific. They have thousands and thousands and thousands of polls like this. And they have a big section of the government that takes care of these polls and they have different jobs and so forth and so on, as you know. So it isn't that... Even if they had done the upkeep, as you say, that still wouldn't answer the question. The question is, what was it that made it conspicuous as the cases that you say? Why is this conspicuous? Okay, Your Honor. Well, this is conspicuous for a couple of reasons. One, I'm sure you all were thrilled to read so many cases about cracks in sidewalks and holes in the grass. That's what a lot of premises cases are about. So as opposed to a hole or a divot in grass or some evenness or a crack in a sidewalk, first of all, the structure here is a massive structure. We can acknowledge that. And it's undisputed that it was in a very high traffic city location. So right there, those are factors a court would consider in terms of determining its conspicuousness. So it's in a conspicuous location and a well-traveled location. Well, conspicuous location, what do you mean by that? I mean, again, there's thousands of polls. On what basis are you saying that the location is conspicuous? Well, because a lot of the cases, as you've probably reviewed, addressed, say, cracks in sidewalks in residential neighborhoods. So in that context, this is not a residential neighborhood. This is a commercial neighborhood. In a lot of cases, people testified that they've seen it for years. It was there and it was two and a half inches. Well, two and a half inches seemed to be a popular depth of some of these cracks. But the cracks, it was uneven. There was a hole, whatever you want to say. And somebody knew about it and walked it every day. We didn't have that type of testimony. In fact, nobody, until this thing fell, this particular poll, there was no evidence. That's the issue. What put the city on constructive notice? We know they didn't have actual notice. So we're talking about constructive notice. So what put it on constructive notice was, and this is where language from the case law is so helpful, and it's not available to a jury, which I think is one of the problems here. But so one of the things that put the city on constructive notice was that the law basically says the city can be charged with being aware of prudent person on inquiry notice. So here we have evidence. The evidence that did come in, there were two incidences, one in 2010 and one in 2011 of street light repairs found to be leaning. And so the small gangs unit had to go and perform repairs on those. And both of those involved specifically issues with the anchoring components, with the washers and nuts holding down the light pole to its base. So it's specifically the same problem that this poll had. So, and this is where we get to my bigger picture of the city's maintenance obligation, because we go to then Vicki Gibbons testimony. She was a foreman of a small gangs unit. She has the most relevant knowledge that came out of trial about what the city's practices and procedures were. And it's important to note that the city urged that we not be allowed to introduce several other witnesses because their testimony would be consistent with Ms. Gibbons about what the city expects its repair crews to do. So we were not allowed to present several witnesses because they said, oh, Ms. Gibbons testimony, we won't refute that her testimony about what the city expects its employees to do is not just her practices. It's not specific to her. That's what any person in a small gangs unit would be expected to do. So first we start with the premise that Ms. Gibbons testified to, which is she never testified that the city maintains property at all. She repairs property. And, but hand in hand with that duty, because admittedly, as Justice Hyman said, there are thousands and thousands of light poles in the city of Chicago. And no one's ever urged that there has to be a formal inspection system that the city goes and inspects every light pole. But what the city has done in deciding how it's going to try to carry out its obligation to repair units, that when you go to repair a street light, you do a visual inspection of the other poles on the block. And Ms. Gibbons testified to that two to three times. She did say then, you know, I would do a further deeper investigation depending on what the nature of the problem with the light pole I was repairing was, but consistently two to three times she testified. If I went to fix the leaning pole, I would do a visual inspection of all the other poles on the She said that two to three times. She did say, you know, we wouldn't necessarily do a further, deeper investigation. It would have to depend on what the specific problem was found to be with the one that we were repairing. But she testified the city employees were expected to do a visual inspection of their other light poles. And so that's where the case law is very helpful because so much of the case law that found no constructive notice says this defect was not easily discoverable. But that is not the case here. That's not what came out in evidence. The evidence here was this defect was easily discoverable because A, the hole in the pole was a red flag to the city that this pole is suffering from structural damage. It is rusting away. And then Ms. Gibbons testified that the covers over the anchor bolt assemblies could easily be removed and they were commonly removed. So she could have easily, or any repair person I shouldn't say her because she wasn't there before the accident, but the repair people who did respond to the two incidents before the incident that injured plaintiff were at the scene. They repaired leaning poles that specifically had problems with their anchor bolt assemblies. And they were required or expected to do visual inspections of other poles on the block. Now, I don't think anyone has refuted that if a city employee went up to this pole and looked at it, that hole was visible as the justices have hopefully seen that hole was visible from a Google earth car driving by that took a picture of the hole. So let me, let me ask you the inspections that you're talking about took place five or six years before the accident, correct? The repairs. Yes. That we say should have led to further. So your, your argument is that when somebody went out there in 2010 or 11, they should have seen the some sort of structural problem that existed in 2016. Exactly. Your honor, because we have photographs. How does that logically follow when you have no evidence that it was evident in 2010 or 11? We do. We have photographs from 2011 that showed up of a hole in the pole, not of a corroded bolts that are bolting the pole to the concrete structure. That's true, your honor, but the case law would instruct us that if they had, if they had performed the visual inspection that they were supposed to do, they would have easily seen the hole. And that in itself would have resulted in the pole being taken down at that point. Of course, then they also would have discovered the anchor bolt assemblies, but so the cases, you know, but I thought the evidence was also that just because there's a hole in the pole does not mean that the anchor bolts are defective. Well, your honor, I don't think that's exactly what the evidence was that our expert witness said. Is that a reasonable inference that a jury could make? I don't think based on the that hole in the pole was being formed. He testified about the, and all the city witnesses, well, the two city witnesses, we got to both acknowledge that, you know, the city is very aware that these streetlights are hit with salt in the winters, salt's piled up, snowy salt is piled up against them. There's obviously just precipitation and there's oxygen flowing through the pole and all of that leads to rusting. And so Ms. Gibbons and Mr. Lane acknowledged that the city knows that the city knows these poles come into contact with corrosive materials and that the rust and our expert said this rust hole, as that was forming, so too were the anchor bolts being deteriorated because A, fluids were getting in through the hole and B, just by virtue of having snow piled up and salt, you know, splattered all over the streetlight it gets in under the anchor bolt assemblies as well. So could a reasonable jury reject that expert testimony? Well, I don't really see how your honor when it, there was a, there was no evidence to refute it. There was no counter evidence. Um, so could a reasonable jury say that there are well over a hundred thousand streetlights in the city of Chicago and because one or many have salt and snow piling up against it over the years, they should all be falling down, but they're not. And therefore it's possible you could have a hole in the pole and not have, um, corrosion of the bolts, the anchor bolts to the extent that the your honor, but here, and that's why I'm trying to stay away from generalities about bigger picture inspection issues because the facts here lend themselves to a conclusion that, I mean, Ms. Gibbons said, if we respond to a leaning pole, we are expected to inspect other poles on the block. So that's where I get into this whole, um, duty sort of factual basis of what the city's point is. If you accept her testimony, the jury could reasonably say or think or conclude that if they saw a hole in the pole, they could go inspect and not find corroded anchor bolts, but six in five or six years later, um, does not give the city constructive notice that this particular pole is defective. Well, your honor, the problem with that analysis is that, you know, according to Ms. Gibbons testimony, if just the whole had been seen, the pole would have been taken down. It would not have been allowed to stand by the city because the structural compromise in itself is enough. So that pole, if inspected pursuant to what was expected of the city employees who did respond to the scene in 2010 and 2011, if factually they had inspected every pole on the block like they were supposed to do and seen a hole, that pole would have been removed. But would have been removed because the hole is indicative of a corroded pole. But if the corroded pole was not the cause or the reason for it falling down six years later, it was the anchor bolts. How do you connect the two? Well, because factually, as far as notice goes. Well, it goes, you know, it goes exactly to the inquiry notice that we say the city was on. The inquiry notice deals with not only the cause, um, the specific cause and fact of a collapse or an injury, but it goes to facts that could be reasonably discovered from a reasonable investigation. So if the city had done a reasonable investigation of the red flag hole in 2011, it would have then discovered the deteriorated anchor bolt assemblies. So, I mean, factually how it would have played out would have been, there would have, if they had followed their procedures, they would have inspected every pole on the block. That hole was easily discernible, you know, visible, which is in stark contrast with the cases that had, you know, hole divots in grass or small holes in grass. What you're saying is not the testimony as I understood it in the record. You have Steigerwald who was not allowed to testify, but what he said was that he was not part of the small gangs crew, so that wasn't his responsibility. He checked on a, and he wouldn't check anchor bolts, and that when he checked that street in 2012, there was no leaning poles. So there is no reason to have an inquiry notice based on him. And then you have Doyle in 2013, who also was not allowed to testify, but he said that he was there because there was a electrical issue with the lights. That's what he does. He's an electrical guy, and there was no other electrical problem. So, you know, you're trying to put a square peg in a round hole, and in that, it seems to me, what we have here, based on the evidence, as Justice Pierce alluded to, the jury could consider all the testimony that was there, which, and from that, make a decision on whether it was conspicuous enough. And you're trying to say as a matter of law, it's conspicuous. That, as I understand, isn't that your argument? That as a matter of law, it's conspicuous. We do think that the court can hold that. One second. I'm going to let you answer Justice Hyman's question, but then I want you to go ahead and get to your third point, that the circuit court's exclusion of evidence was substantially presidential and affected the outcome, because otherwise, you're running out of time here. So answer that question, and then go right to your third point, please. Okay. So, Your Honor, yes, we are saying that it could be held as a matter of law to have been conspicuous because the length of time that it and courts have found the length of time, the passage of time to be enough. And then, but you also have photographic evidence. Where do you have it? My understanding of the law, in a case of Cook versus Village of Oak Park, the court said that it's two questions, whether the defect existed for a sufficient length of time before, and what was the nature of the municipalities' notice, constructive notice. So, and I went back and I looked at the cases upon which that case relies, and it said the same thing. And I went back on the case that that case relied, going back to the 40s, and the law has been consistent. So I'm wondering, one is not enough, just because it's over time doesn't give you constructive notice. Again, it's two. So when you say that, I'm just wondering, is there a case you're relying on? How do you come to that? No, Your Honor, I agree. You do have to have both. But we would contend that because the whole itself was conspicuous, that that would have, and the city had acted on inquiry notice and conducted a reasonable investigation, it would have necessarily led to the discovery of the anchor bolts as well. So I'll get on to my third point, Judge Walker. So the exclusion of evidence, well, as we've mentioned, you know, Judge Hyman, you said Mr. Doyle wasn't allowed to testify. One issue with him was, or no, I think it was, I'm sorry, I think it was Mr. Steigerwald, the person who went to respond to a report of a leaning pole, but then found, oh, there's no leaning pole, it's just a open refractor door. So that right there was, you know, evidence that somebody thought they saw a leaning pole and his, you know, testimony regarding whatever inspection he performed was not extremely heartening for us pedestrians. And I think arguably showed that he didn't do what the city expected of him when responding to a call of a leaning pole, even if the specific thing he fixed wasn't an off kilter pole, someone reported one. So he had an obligation to inspect the area. And we feel that the excluded evidence, and as I've said, it's not necessarily evidence that the city had constructive notice in terms of seeing the whole, but it had, it's evidence that the city had multiple opportunities. And if we could have presented three or four more witnesses who said they were actually at the scene before this occurred doing work. I mean, this is where I find it amazing. This is a such stark contrast with cases where it's just residents who live near a sidewalk. And yeah, they all knew about this crack in the sidewalk, but not one city employee was ever said to have been in the area. This case, you have city employees there multiple times. And if the evidence hadn't been excluded, the additional witnesses, a jury would have really felt like, gosh, they've had five witnesses, five streetlight repair people out at the scene before this happened, who could have seen this hole. And I think five, where do you get five? I thought most of those witnesses of two or three of them were after the thing. No, three of our excluded witnesses were there before the fact there Okay. Well, then we're down to three, one being the light though. Two of them, we talked about Doyle and Steigenwald. Steigenwald, huh? And then Soviec was also excluded. He was there the day of the accident to respond about another leaning fall. Right. Well, day of the accident. So, so we only have two that I can count beforehand. Well, no, we have two others, Phipps and Hakeem. Oh, Phipps was there. He responded, he said he responded a call in January or February of 2016. And all out there was a light was out. That was what he was looking for. Right. Lights are on. That's his duty. He doesn't, his duty was put the light, make sure the lights are on. Well, your honor, I understand that could be said, but these are all people in the same division of electrical operations and the testimony, I mean, these aren't, you know, garbage collectors that was, you know, a subject of emotion to eliminate any random city employee can't be held to have had a duty with respect to these light poles, but people who actually worked on them did have, you know, there is an expectation that they would report something if they saw it, or just at least observe the poles in the area when they're responding. That's what Ms. Gibbons testified to. Well, right. And so, but so she established what's expected of the city employees. And then, but unfortunately, I mean, she and Mr. Lee, neither of them were at the scene before the accident. So we were limited to two witnesses from the city who were never at the scene beforehand, and that could not have, but impacted the jury. I mean, to have a jury not hear from one witness who was at the scene beforehand, and hear, you know, secondhand explanations of the repairs that took place and what the duties were upon doing those repairs is not as impactful as it would have been to have three witnesses who were actually at the scene before the occurrence. And I mean, that's where I think the problem is, the city seems to equate its duty to maintain to be a duty to repair. And that literally means you can only have cases of actual notice. That literally means constructive notice can never be imputed to the city, because it's meeting its duty to maintain just by repairing things. And that's all the evidence showed here. The city street gangs unit just repairs things, but they're expected to look around the maintenance that they do extends to looking around and examining the poles on the same block to see if they see any issues. So that's their duty. That's their standard of ordinary care that they've established. They breached it because nobody saw this hole, which was readily visible, and the hole would have necessarily led to the removal of the pole, which would have led to the discovery of the anchor bolts assemblies, but it was certainly evidence of the potential for degradation of the anchor bolts assemblies. I think my time's up. It is. Okay. Thank you. Thank you. Great job. Miss Masters. Good afternoon, your honors and may it please the court. The jury in this matter returned a verdict and answered a special interrogatory on notice in the city's favor. Miss Kovarubias now seeks to overturn both the standards for obtaining judgment notwithstanding the verdict and for a new trial are rigorous, and she has not satisfied either, especially given the evidence against her on several elements of her short life. Let me ask you a specific question. One of her witnesses was not allowed to provide six of these witnesses, so she was not allowed to have any witness who was on the scene before the incident. What's your response? I mean, why should that be? I mean, these people were on the scene on that street where it's visible from a Google car to have this hole. So why shouldn't she be able to have those witnesses? I'm not talking maybe the ones that were there the day of or afterwards, but those, at least those two. So your honor, let me break down your question if I can. First of all, the comment that Miss Kovarubias was not allowed to have the employees who responded to incidents in 2010 and 2011, that they were sought to call them. So she could have called the people who did the repairs in 2010 and 2011 and questioned them about what type of what they saw and what type of inspection they did. I'll make sure I understand the facts. That's Mr. Doyle and Mr. Strygerthal. Okay, so who are you talking about? Okay, what Miss Kovarubias says in her brief, and which I, as I understood, and maybe I misunderstood, but I understood her to just say that they were prevented from calling any witnesses who had been on the scene of these other repairs in 2010 and 2011, and then also who are unnamed, and then also barred from these three other witnesses who were there before. Then let me clarify my question. It's very specific. It's Doyle and Strygerthal. Okay, so a few points about that, your honor. First of all, admission of similar or prior incidents is well within the discretion of the trial court, and the trial judge in this case properly excluded the prior incidents that didn't involve the small gangs crew and repairs to leaning poles. Doyle, I'm sorry, did you have a question? Okay, so why is it important that they have to be a member of the small gangs crew? That was, it was small gangs crew or repairing leaning poles, but it's because the small gangs crew are the people responsible for leaning poles, and he had the discretion to admit, to decide which incidents were similar enough to put so that, Ms. Covarrubias, so that they could be admitted and wouldn't prejudice the city, because we know from cases such as Zemir versus City of Chicago that the city is not liable just because people are in the area. There has to be some nexus between what people were in the area for and what the defect in the property that becomes the issue of a lawsuit is. It's not just that you were there before, so what the court did, frankly, over the city's objection that all of this would be prejudicial to us, is he drew a line, and that was certainly within his discretion to do, to admit those prior incidents in which leaning poles were involved and the small gangs crew, it came down to these incidents in 2010 and 2011, and to exclude other witnesses. Now, what has happened in this instance is that Ms. Covarrubias has neither shown an abuse of discretion, nor has she shown prejudice, and the reason she hasn't is because, because none of those witnesses conducted similar repairs, as you were talking about, I think you asked about Doyle, and Doyle was on the scene, I believe, because of a light pole that had fallen on a bus. There was no evidence that ultimately that was because of vandalism, that was an unrelated incident. Steiger, you asked about Steigerwald, I believe. Yes. He was on the scene, he was called out to inspect a pole, a leaning light pole, but then he testified that what he saw in this deposition he testified was an open refractor. Now, that's a different problem, right? Now, there's been a lot of statements in the brief and that argument about what Vicki Gibbons testified to, and about the scope of visual inspections, but the fact of the matter is that Ms. Gibbons' testimony about visual inspections was that repair people, on the small gangs crew at least, would look for leaning poles. That was the scope of their visual inspection on a block, and so we can assume that when witnesses were out there in 2010 and 2011, if they, or the jury had the right to presume when they were out there in 2010, otherwise it would have been reported. That was a reasonable inference a jury could make. I probably should have asked this question of Ms. Bartolussi, but was there ever an offer of proof as to what those witnesses who were excluded would have said? Well, so your honor, in our view, that is an issue for which there has been invited error, because first of all, in her opening post-trial motion brief, Ms. Kovar-Rubias stated that she had made adequate extensive informal offers of proof, so the city responded based upon the deposition testimony and said, well, there was ample reason to exclude these witnesses because their responses had nothing to do with leaning poles, and their deposition testimony says they don't inspect structure. They just look for, are the lights back on? Are there any other open refractors? That, by the way, was consistent with Ms. Gibbons' testimony, so in that sense, Ms. Kovar-Rubias ended up conceding, though, when she filed the reply to our response brief. She then said that the city was just speculating about what the witnesses would have testified to. At that point, this issue has not even been properly preserved for review, because if you're saying that we're speculating based on the deposition testimony, you by definition have not made an adequate offer of proof, and more specifically, to the extent there's now an issue about what the witnesses might have testified to if they had been asked, Ms. Kovar-Rubias never moved to make a formal offer of proof, and if she wanted to preserve that issue, she needed to do that at trial, during trial, not after trial in a post-trial motion, and there is no case cited to this court that we're aware of that holds that one can be, one is entitled to sort of come up with new evidence or new issues and speculate about what someone would have testified to had they been called when they haven't made an adequate offer of proof. And we add, as well, that the circuit court in this case found parts of the informal offers of proof, which Ms. Kovar-Rubias was allowed to sort of put in the record and submit in the post-trial process, the judge found part of those to be inaccurate and to not be properly summarizing the testimony of the witnesses. The offers of proof here have to do a lot with what Ms. Kovar-Rubias presumes witnesses would say in response to Ms. Gibbons' testimony and how they could have been impeached, but in fact, I want to backtrack to that because Ms. Gibbons' testimony was at the was based upon the scope of a problem. And here, JANOV requires that all the evidence needs to favor Ms. Kovar-Rubias overwhelmingly so that no rational jury could have reached the result here, and that standard isn't met. And it's not met because Ms. Gibbons' testimony and David Lee, both of the city witnesses, their testimony supports the idea that the finding, the answer to a special interrogatory, that the city didn't have constructive notice. The answer was reasonable, it was based upon reasonable inferences in the evidence. So a small gang crew goes out to respond to calls of leaning poles. The jury heard that when they do that, they look to see if other poles on a block are leaning. They report if they find any. That was enough for which a rational jury could conclude that the city lacked any notice of any issues with the subject pole. Ms. Gibbons further testified, and that is the scope of the visual inspection to which she testified. And if there's some confusion in the record about the scope of the visual inspection that Ms. Kovar-Rubias feels favors her, the jury was not entitled, she is not entitled to J&OV on that basis. Because if there was lack of clarity over the scope of the inspection, that was Ms. Kovar-Rubias' burden to clear up. And absent that, the jury could draw the inference that no one responding ever saw a leaning pole. But one of the things the plaintiff is arguing is conspicuousness. And with regard to that issue, as I understand the brief that they filed, they're saying that's a question of law now that we should consider. In your view, is that a question of law or probably one of fact that the jury considered? It is one of fact for the jury to consider. And that is because none of the factors to which Ms. Kovar-Rubias points, the age, the supposed conspicuousness, the size, all of those were within the realm of the jury to consider and decide and put within the context of the city's response to leaning poles. And in particular, I want to point out the jury saw the pictures. The jury saw what this hole looked like. The jury had a demonstration of the physical size of the collapsed of three inches by one and a quarter inches and also could see from the pictures themselves that it was smaller in 2011. The jury heard Ms. Gibbons testify that she would not have expected any crew out there in 2011 to have seen this hole. So it's not sufficient that one can look at a Google Earth picture and see it. If one goes about examining properly, of course, one might see something. That's not the test of conspicuousness. There's also this issue about whether it's in a busy area or a commercial district. A jury was well within its confines and its job to determine whether that had any relevance because this is not a sidewalk. This is a street pole and the defect, by the way, is street side. So a jury in its everyday experience can know when you walk down the street, are you going to be seeing a defect if you're on the sidewalk at the base of a light pole? But wasn't the testimony that they do actually inspect other parts of the street when they're there to do those repairs? For example, when they repair a light pole across the street, that they do do visual inspections of other poles in the area. So your honor, the answer to that is the term visual inspection was used, but the definition of visual inspection, according to Ms. Gibbons, and certainly one that the jury could draw, is that the inspection was to just look for leaning poles. It wasn't a structural inspection. She never testified that it meant that one was actually going to approach all the other light poles on the street and come close enough to determine whether or not there was a hole or something was rusting. So your argument is that it was a visual inspection and not necessarily a physical inspection? That, but I'm also arguing about the scope of her visual, what she testified to was a visual inspection. And in fact, what she specifically testified to is that she would expect repair tickets if in 2010 or 2011, the crews that had responded had seen rust or a hole or the anchoring components were corroded, she would have expected that to be on the repair ticket. And it wasn't. And so from that, a jury could conclude that the problem to which those crews responded in 2010-2011 didn't involve rust or corrosion. And further, Ms. Gibbons testified if there was no rust or corrosion on the pole to which a crew was responding, then crews didn't go and conduct some type of physical inspection of the other light poles on the block and look for that issue. And again, this is all about the jury. Could the jury draw from that testimony the reasonable inference that we never had noticed? And the answer to that is yes. It was an issue of fact well within their discretion. The other issue, if the court doesn't have any questions about constructive notice that I want to talk about, is that Ms. Kovarubias did not just lose solely on a special interrogatory issue. She lost because the general verdict was if you could comment on that. Thank you. I want to point out that she is not entitled to a verdict in her favor also because she has not shown breach of the duty of care. And there is evidence, of course, of our approach to taking care of light poles that involved we see a problem, we fix it. If we see leaning poles, we look for those, we fix those. In some instances, depending upon what we see when we go out to a street to repair a light pole, we conduct further inspection, depends upon what we see. And we also rely upon reports from citizens. As the circuit court so correctly noted, their quote appears to be no evidence from which the jury could have assessed whether the city exercised ordinary care and should have known of the rusted condition of the anchoring components. Put differently, there was no testimony to raise an issue about whether what we were doing failed to satisfy our duty of ordinary care and that it breached that duty. And again, it's a jury issue. And in the absence of any inferences that we didn't have noticed and that we satisfied all of our other obligations. If the court has no further questions, we'd ask that the judgment be affirmed. Thank you, Ms. Masters. Good job. And Ms. Bartolucci, we're back to you. I want to ask Ms. Bartolucci if you can respond to a couple of things, and the justices may have more questions but respond to the special interrogatory to which the jury answered and also the issue that counsel argues that there was no adequate offer of proof is the term that I believe counsel just used. Right. Your Honor, if I may, I'll answer your last question first about the offers of proof. So, the hearings on the motions in limine, as you might have observed, they went over several days and it was apparent that the attorneys and the judge were very intimately familiar with the facts and the depositions. About 24 depositions were taken and the judge had been provided all of the deposition transcripts. So, unfortunately, trials are messy. Parts of hearings are excerpted. It's not super easy for any of us who weren't there to read those transcripts and say what the parties were referencing all the time. But, you know, the parties did make sure that the judge had copies of every deposition transcript. And so, there are arguments, we feel, that preserve the issues. I mean, our counsel at points did read from the transcripts from deposition testimony of witnesses. But out of concern that an appellate court might not have a good sense of what the case was, we did ask to submit formal offers of proof or make formal offers of proof with live testimony after trial. And I agree that that's sort of a novel concept, but it's not really any different than having a trial and doing your offers of proof after the trial, which does occur. So, you know, it was an attempt by us to make a clear appellate record of what the expected testimony was going to be. What case do you have that would allow you to give an offer of proof after trial? Well, your honor, there is no case. I want to stop you there. So, there is no case. And second, there was no offer of proof given during the trial or at Emotion and Lemonade before the trial. I mean, that's a matter of fact, because you said that, you know, this is novel and everything else, the words you were using, but a formal, following the rules, offer of proof never happened. Formal, correct, your honor, but cases absolutely allow for informal offers of proof. In criminal cases, it's a little different than civil cases. In this case, there's no evidence at all that the judge read any of those transcripts. I think he did reference testimony that he had read. He may have read some testimony. I don't know if he read any of the transcripts. And if he references that, it doesn't mean he read others. And anyway, that's not an offer of proof. And he kept saying, don't summarize for me. I want you to give me the language. That's what he kept saying. So, he didn't believe there was an offer of proof. Well, your honor, that is one of the difficulties, I think, that counsel was presented with, which was that after the completion of discovery, once you know truly what the full breadth of evidence is, and you know, oh, these guys actually did not conform to what they say is required of the city or what their foreman or boss said is required of them. There could have been impeachment testimony that hadn't occurred yet in the depositions. But I mean, it was definitely clear. The issue that we wanted to present them for more than anything was just to show that the city had streetlight repair people at the scene before this incident. I mean, in a case of constructive notice, as we've said, that's a legal construct, a plaintiff who can present more evidence of opportunities for the city to discover a defect is obviously going to fare better. And that was the only reason, truly, that we needed to present them for was to say, look at all these opportunities the city had. So, and I just want to comment on something about, you know, the duty to inspect and conspicuity, because it may not be conspicuous to a pedestrian. Let's say this. Certainly, you know, pedestrian could be held to have noticed this hole and avoided the pole, you know, because of some obligation to just see this poll and passing the facts that were presented gave rise to a duty to do further investigation. And as the Buford case sites, it says every unusual circumstance is a ground of suspicion and demands investigation. So two leaning poles on that same block in 2010 and 2011, were unusual circumstances that warranted investigation of the other polls on the block. And I disagree that the scope of the inspection that would have occurred is as counsel represents, because Miss Gibbons said several times, it's a visual inspection, not only didn't qualify it as only for leaning poles, she said a visual inspection multiple times. So we're not expecting city employees just walking down the block to see this hole. But if the facts gave rise to a duty to conduct further investigation, if they had walked up to this pole and looked at it, they would have seen the hole. I mean, we are literally just asking the city to look at this pole. But you're also assuming they would have also seen corroded anchor bolts. I don't think that's necessary, Your Honor, because if they wouldn't, if it's not necessary, that was the cause of the pole falling five years later. I understand, but the contemporary hole five years earlier does not tell you that it's reasonable to assume that the bolts were corroded to such an extent that they would have replaced the pole five years earlier. This is five years later of bolts, not a hole. If the hole was the reason the pole fell over, it just broke and tipped over. Absent the bolts, I could see the logical connection. You're saying if they saw the, they should have seen the hole five years earlier. And had they seen the hole five years earlier, they would have seen the corroded bolts and removed the pole, but they didn't do that. So five years later, the pole fell over because of five years earlier. Well, it's not exactly that, Your Honor. That's not exactly what I'm asking you to agree with. I'm asking you to agree that with the fact that I think a reasonable jury could sit there and conclude that there's no connection there. It's not notice. Go ahead. I would just ask the court to consider the fact though, that a hole, a rust hole in a pole is evidence that that took a long enough period of time to become physically corroded and disappear from exposure to the elements. So if there's one aspect of the pole that's been so deteriorated, it's possible that others are. I'm not saying that would have been detected just by looking at the hole. However, the fact that the hole was there was a red flag to the city that this streetlight is structurally failing. It's structurally suffering. It's being attacked by the elements. Much like, I think this is very much like the facts in Buford, where the CHA had knowledge of vandalism and these bracket things, jibs, I think they were called, being pulled out of elevators. This is knowledge that something is attacking your property. Something is making your property unsafe. And the city knows that because it knows salt can corrode streetlights. So if you see a rust hole, you know your property is being attacked by the elements. It's now in a condition that everyone agreed would have required it to be taken down. The hole in itself would have required the pole to be taken down. And if that had happened, because a city employee had actually just looked at the pole as they were supposed to do, the anchor bolt assemblies, you know, would have been discovered. But the point is there was an opportunity and reason to take that pole down and to look at it on the dates that the city did have workers there. And if they would have just looked at this pole and seen a hole, it would have come down. That was unequivocal. So that's, I understand your problem with, but the bolts weren't visible. But the fact is, if someone had walked over to that pole, literally, and just looked at it when they were there performing other repairs on poles, like Ms. Gibbons said, they were supposed to do a visual inspection. If someone would have just stood in front of that pole and looked at it, they would have seen the hole. And it's unequivocal that the pole would have been taken down. So it is the failure to investigate when facts put the city on notice that its property was being disintegrated before its very eyes and before its employees' eyes. I mean, that, you know, I think that's very similar, actually much stronger than the evidence in the Buford case. Because the Buford case, a maintenance person had actually ridden the elevator 30 minutes before the accident that injured this little girl who fell in an elevator shaft. 30 minutes. We're talking years that this pole existed and opportunities for the city to have discovered the hole, which would have necessarily meant the pole was taken down. That property, just like the vandalism in Buford, was being attacked. You're actually out of time, but if there's a few points you wanted to make, or if you wanted to respond to, you can take an opportunity to do that. I just want to clarify that, you know, we're asking for a couple of different things. We're either asking for judgment notwithstanding the verdict based on the overwhelming evidence we feel was presented that the city was on inquiry notice and could easily have found this defect if it had conducted the investigation it is supposed to do. But if the court doesn't believe that standard is met, I do believe the manifest weight of the evidence was contrary to the jury's conclusions because the city presented no evidence of maintenance. It presented evidence of repairs and a failure to do the visual inspection it said it should do when it responds to leaning pole issues. So we ask you to reverse the judgment and the verdict against the plaintiff and remand for a new trial or alternatively enter JNOV in plaintiff's favor and remand for a trial on damages. Thank you. Okay and thank you to you both. We appreciate your excellent work, your excellent briefing, your excellent arguments, and we just appreciate excellence and you both have given us that. Thank you, your honor. Have a good day. Thank you, your honor.